Mr. Gorman, we're ready when you are. May it please the court, my name is Terry Gorman. I represent the appellant in this matter. This is my first time to be with you and I perceive it to be an honor. Thank you for the opportunity with me today at the very back are Kenneth McMillen and Lisa McMillen, the parents of the incapacitated adult. Chris. You were counsel on each of the respective pleadings? The librarian ... It's a public library. The librarian knows he has Tourette's, so she's not going to kick him out. But it's an inconvenience. Other people in the library are upset. It's always an issue. One day, the young man comes in and is part of his Tourette's syndrome. He says, oh my God, I'm going to kill everybody. Well, at that point, the librarian says, I've had enough. There's no gun. There's no weapon. There's nothing to indicate it's not just part of his Tourette's. She calls the police. The police come and arrest him. Felony charges for terrorist threat. At that point, a deal is made and offered to the young man's parents. You can agree to never again go in the library ever again and we'll drop the felony charges. Rather coercive and under a lot of duress, they agree. Now, in this case, there was a complaint department within the library. The complaint department within the library deals with overdue books, what books do you want, is everybody conducting themselves appropriately? But there's no complaint review board for being kicked out of the library. And that's important because when he was kicked out and banned from the library because of his Tourette's syndrome, it wasn't merely you can't go review adventure stories anymore. You can't review, you can't read spy stories. You can't sit here anymore because you're disrupting people. You can't, we're not going to require you to go to a back room and do your work, do your reading. It's a complete ban. And under those scenario, which is what we have here, if we applied the Frye test to those questions, the answer to both of them is yes. He was banned from a public building and wishes to sue for being banned from a public building. Let me ask you this. In your initial pleadings and each set of pleadings, are you saying you were not attempting to assert the deprivation of a free, appropriate public education right on behalf of your client? Are you saying that was not, I heard what you just said. Are you saying that nowhere in your pleadings that that was what was being asserted, the denial of a free, appropriate public education within the words of the statute, within the context of the care and so forth that was going on? I mean, that's what was viewed below in the non-exhaustion, so help me understand. Yes, sir. In the first amended complaint, perhaps the second, there was language that was indicating we were arguing a fape. That was my inartful drafting, honestly. In the last live amended complaint, I believe I cleared that up. Now, counsel will say, as I predicted they would in my brief, that this is a fape, fape, fape, fape case and that all I'm trying to do is be clever in the wording and the wordsmith. Well, I mean, talking about the expulsion, you say he should have had a manifestation determination review, other required hearings before he's sent to an alternative campus. I mean, that does all sound in procedures that IDEA provides. Absolutely. And? So why isn't this an IDEA case? It seems to me your hypothetical at the beginning would mean every case involving the expulsion of a disabled student is outside of IDEA. A complete ban would be, your honor, because this is not a ban. So any expulsion of a disabled student is not, does not fall under IDEA, is your? We have more than an expulsion here, though, your honor. And again, as I stated in the complaint, the reason I went at length with the torrid history of this case and regarding the IEPs and the student had been there since kindergarten. There had been issues forever was to put in proper context the level of frustration that ultimately led to the school declaring a terrorist threat and having him banned and work in conjunction with the county attorney. You try to excuse the first couple of complaints. In Frye, Justice Kagan says one thing you can look at to see whether the case is really an IDEA case, because she says look at the substance of it, not the labels. She says you can look if they actually did try to go through the IDEA exhaustion procedures. So why can't we also look at the fact that you did originally bring this case as an IDEA case in deciding whether that's actually what it's all about or not? Because that was actually my inartful drafting, your honor. Well, what if a lawyer inartfully goes through the IDEA exhaustion procedure? I mean, I think Frye is saying look at what's really going on here. Yes, and what's really going on is that he was banned, again, not just expelled, but banned. Expulsion itself is less than what we have here. We had a complete ban. He was banned as a result of the agreement reached, right? It was banned as a result of the agreement reached under DeRuris. You had filed, or there was, as I recall it, some urging by your side, I guess there was an alternative, some alternative procedure in a different tract or whatever, disciplinary that was on the table as well, and apparently that's not correct? No, sir. All of that has to do with the FAPE issues. Well, that's what I know. But I'm saying when you were negotiating, in the throes of all that had transpired, we read it with the teacher, et cetera, et cetera, then there's this negotiation. I mean, there are the charges that are out there, then there's some negotiation about dismissing the charges if he agrees not to be in the school. Now, I thought I read it while in the midst of the conversation that the FAPE or the school there is an alternative provision of him being put in some different tract that your side had urged to be considered, but I guess ultimately rejected as too punitive. Am I incorrect that that's not an equation? No, sir. Before the ban, there was, again, within FAPE, there was a sanction to the alternative education, to DAEP. All right? Now, also as stated, when the client was talking to the school about that, the school raised the ante and said, if you ever bring him back here, we're coming back with more civil charges. And so the ultimate issue is the due process process does not allow, it cannot have provided a remedy for the ultimate ban. An ultimate ban... That's what you have to show through going through the exhaustion process. That's why we have exhaustion. But if it is something that the administrative hearing officer cannot even do, then why is it necessary to do it? You make your record, I suppose. Well, but to make a record on something that is not applicable to the issue. This wasn't... If the ban was the heart of it, I mean, why agree to it? Well, they agreed to it because you have an incapacitated son who is facing felony criminal charges. And under duress and a little coercion, the family agreed to it. What's the record of coercion, counsel? Simply the set of circumstances in front that were presented with the court, that the family is presented with the following. If you agree never to have him go to that courtroom, to that, excuse me, to that school again, then we will drop the felony charges. That's by definition, Your Honor, is a coercive and situation ripe for duress. You're faced with... The complaint, I mean, what you're talking about seems different to me than what the complaint says. The charges and the deal to get rid of the charges is just one aspect of a lengthy list of allegations in the complaint that talks all about New Caney refused to modify the August IEP. That led to the assignment to this English teacher, all these inadequacies. And then it says these charges were brought against him because of his disability. That's all correct. And so you don't think that could be dealt with through the exhaustion process, that you could prove in that process that this was done against him because of the disability and their refusal to accommodate him? Yes, Your Honor, because had they proceeded with a manifestation determination review, as counsel for the police says, all that would have done is say he doesn't have to go to DAEP. The hearing officer had absolutely no authority whatsoever to cut a deal with the Montgomery County attorney. And yet that's what happened here. And again, the complaint goes at length, Your Honor, only to put in context, as I stated in my brief, to understand, again, the librarian's continued frustration with our young man of Tourette syndrome. But you're not suing the DA. I mean, what is the violation of law that relates to this deal that was coerced? Our position is that there was obviously a deal cut between the Montgomery County attorney and the school. So what law did it violate, the Rehabilitation Act? Absolutely, Your Honor. Because it was discriminatory? Absolutely, Your Honor, because he was being threatened with felony charges for a disability. And the due process over here, Your Honor, could have dealt with the DAEP, but that TEA hearing officer has absolutely no authority whatsoever to deal with the ultimate ban because the ban was in part in place by the Montgomery County attorney. You filed a 1983 claim also, and obviously it is your contention that a claim under 1983 exists independent of IDEA. Yes, because it's a violation of a person with a disability. And so it is a 504, and it's also a 1983. All right. Now, how have you pled municipal liability that's required for the 1983 claim? Sure. Municipal liability, as you know in these matters, is always very difficult because unlike years ago where we had deed restrictions that would say, you shall not sell your home to a person of color, we're certainly not going to have a policy written by a school district that says when we get fed up with somebody and can't take it anymore, then we're going to discriminate against them. What I believe that we have presented, and the record shows that, Your Honor, is we have a situation where... Please tell me what you pled that would suffice for municipal liability. Yes, sir. I pled that there was a policy regarding anti-discrimination. I pled that the only way that deal could have been cut is in conjunction with the school. And I also threw then in the TEA report. Now, the TEA report isn't determinative by any means, but, excuse me, not the TEA report, the Department of Education report, but it covers the same timeline we're in. And that raises the spectrum of school districts violating federal law. There's no question that those particular school districts that were studied in the Department of Education report violated the law. The Department of Education concluded that all of TEA had been coercing school districts to lower the numbers. And so, without some discovery, Your Honor, I'm not in a position where I can read the mind of the school board. But what I pled is that there's no way the deal with the county attorney occurs without the superintendent and, frankly, probably without the board. Now, I don't have that on the board agenda, but, Your Honor, how else can there be a deal with law enforcement related to the school? And how can he say, we will drop this as long as you never go back? That, on top of the TEA report, stinks. And I believe that that allows us to go back and have some discovery and do discovery with regard to exactly what the discussions were between the school district and the Montgomery County attorney. What actually did happen? And that's where I believe the municipal liability comes in. Oh, I still have green. So, the allegory, I believe, fits. He was kicked out. The remedy, there is no remedy here, Your Honor, at the due process level. Again, now I'm on the right. Thank you very much. All right. Thank you, sir. You're reserved to rebuttal. Mr. Rush? Good morning, and may it please the Court. I'm Corey Rush. I represent New Caney Independent School District. The gravamon of this case is and always has been the alleged denial of a free, appropriate public education. And that means that the administrative exhaustion process under the Individuals with Disabilities in Education Act, or IDEA, I'll probably say those interchangeably and I apologize, are required to be gone through prior to coming to court, regardless of how the claims are labeled. So, have you been in the case throughout? Yes, sir. Good. All right. Well, throughout the, let me rephrase, throughout the litigation, I was not involved on the administrative side. All right. So, what we have here is exactly what is warned against in Frye, and that's the artful pleading to get around the exhaustion process. When it's undisputed, the administrative process in this case was abandoned. It was initiated and abandoned. And as Judge Costa, you aptly mentioned, Justice Kagan said that that is absolutely an appropriate way to look to see whether the gravamon of the case is the denial of faith, to look at the history of the proceedings. And here, the history of the proceedings even before it hit court involved the IDEA, involved the administrative process. And then when it hit court, after that process was abandoned, there was an IDEA claim in the original complaint, because this is and always has been about the denial of faith. What about his argument that the administrative procedures could not undo this deal with the prosecutors that banned him permanently from school? So, whether or not the deal could have been undone by the adhering officer, we weren't a party to that deal, so I guess I can see how that argument plays in here, because that was between the family and the county district attorney's office. But what could have been solved through the administrative process, as my colleague said, was to have an MDR review, the Manifestation Termination Review, or a stay put to keep Christopher McMillan in school while the administrative process was going through. And whether or not they made a deal on the outside, I mean, I suppose you could bring that to the adhering officer, and the adhering officer could say, I don't have authority to rule on the private deal you made with regard to these criminal charges. So was New Caney the complainant, if you will, on the charges that the county attorney was considering? No, sir. The arresting agency was Montgomery County, and the prosecuting office was the Montgomery County district attorney's office. So the alleged terrorist threats or whatever they were that was sent to the county, New Caney was not the catalyst for these charges, is that what you're saying? Well, information was shared, but the investigation was spearheaded based on my understanding. And, again, I came in on the litigation side of this. My understanding is the county was the spearhead of that investigation and subsequent arrest. But I think importantly to note with regard to the administrative process here is that stay put MDR side of things. Before the deal was reached, the status of the issues between Christopher McMillan and the district was that there was a proposed expulsion to DAEP, to the district's alternative education placement, based on the terroristic threat charge. So that was the option presented to them? Correct. I mean, he'd been in this situation since kindergarten. At the time this occurs, he was what, 17, 16, 17? Yes, 16 or 17. 17, so he's been under IDEA and some kind of plan throughout. So what was he, a senior, about to be a senior? I'm sorry, Mr. Andrews. He was about to be a senior? Yes, sir. All right, so when these issues arose, this alternative situation, that was what New Caney presented to the family? That was the mandatory expulsion under Chapter 37 once allegations forming the basis of the charge of terroristic threat were brought to the school's attention. So once elements of those charges are alleged, the school then has a mandatory obligation under the Texas Education Code, Chapter 37, to place a student in alternative education placement and or, if it is serious enough, into the juvenile justice alternative education placement, which is an off-site, county-run version. But the DAEP here in the record is New Caney ISD's own alternative education placement for disciplinary management. So would that have been in lieu of the expulsion? That is the expulsion. That is the expulsion. So we don't expel to the street. We expel to— So he's expelled from the regular FATE program and then into this alternative program. Correct. Which purports to still satisfy the tenets of FATE, I guess. Correct. Students in DAEP would still receive an education program in general, and special education students would still be on their IEPs in the DAEP setting. So that doesn't change. So that action was rejected? That action was never fulfilled because of the abandonment of the process once the family entered into the deal to withdraw their student from New Caney ISD. And the way it's pleaded in here, in your record, is about they felt they had no other choice than to sign this deal, and they just gave up on trying to work anything out with New Caney ISD. That is the abandonment of any administrative process with regard to my client. And the Grobman issue here is interesting because it is absolutely left in about the IEPs and the behavior intervention plans and how successful the student was until the IEP changed in August of 2015, and that's when everything started to go downhill for taking everything as true as we do in the 12B6 context. So the educational failings, this teacher overstepping and allegedly proselytizing her own views onto the student, the student exercising his own religious thoughts and social experiments, however it's worded in here, all of that ties back to the IEP and the allegedly failing IEP, up to the fact that they blame the failing IEP for the fact that the student had these discipline issues that got worse and worse and worse that led to the action that led to the expulsion. And it's impossible that you can say that that's anything other than the Grobman. My colleague called it the context. I think the context is the Grobman here. What is this really about? It's about an alleged failure to have a meaningful IEP developed and stick with it that was helping with the student's behavioral issues. And on the note of expulsion, the hypothetical presented to this panel was about a student with Tourette's, or I should say a child with Tourette's, in a library being excluded, given some sort of trespass order to not come onto the property. But that's not an expulsion. Expulsion is a term of art. It's uniquely school district language, and I would venture to say, venture to guess, I suppose, that that's a word used throughout this entire country. Expulsion is school-based. If this was a student who was not allowed to enter a football stadium because we didn't have necessary ramps for a quadriplegic student, let's say, then that is purely an access problem. Sure, you could sue under the Rehabilitation Act or ADA for disallowing access to a disabled student in that sense. That's not an expulsion, though. And that would also have nothing to do with a free and appropriate education. Whereas here, the issue is that from August of 2015 until the expulsion, the educational experience for Christopher McMillan was allegedly deteriorating, was getting worse, his behavior was getting worse and not managed appropriately through the IDEA channels. And that is absolutely the central point here, that it was the IDEA channels that were not allegedly being appropriately implemented, and the administrative remedies were there to cure these. They were started and they were abandoned and then were in court on those very same claims. If you took out 504 in 1983 from this pleading and just read it cold, I would venture to guess you would think it was an IDEA claim, straight up and down. Let me ask you about a question the Supreme Court in Frye said it was not going to decide. This question about whether if you're seeking damages, that has to be exhausted, because this is a damages suit, right? I know the case on the lower courts is on your side, but the statute says you have to exhaust when you file a civil action seeking relief that is also available under the statute. And damages aren't available under the statute, so why? I mean, just on a plain reading, why should the exhaustion provision apply to a damages suit? Well, I think there's a legalese reason and then there's the slippery slope reason. The legalese reason is there's actually a fairly recent case. I can point to Panel 2 out of the Third Circuit, unfortunately, but it is JL versus Wyoming Valley West School District, and that is 722 Federal Appendix 190. And what's helpful about this particular case is, just as you just suggested, the argument was, well, we brought a claim for damages. Therefore, take us out of the IDEA. And this Court said our conclusion does not change because JL requested money damages, which are not available under the IDEA and cannot be awarded at an administrative hearing. We have held that this issue is not dispositive because, one, the complaint did not seek money damages exclusively. Two, district courts are empowered to grant relief beyond that requested. And three, money damages may sometimes be awarded as reimbursement under the IDEA. And it does survey other district courts or other circuit courts, and unfortunately not the Fifth Circuit, but they survey that the same conclusion has been reached by the 10th, 1st, 6th, and 11th. And then on the slippery slope side, if the answer to getting around the IDEA exhaustion requirement is merely to plead damages, then fundamentally we've killed the exhaustion requirement. That's always been why we see these 504 claims get brought in with the IDEA. That's not new. It's just whether or not they went through that channel first before bringing them. So the opportunity to seek damages under 504, under 1983, under whatever statute you can imagine, I would suppose, doesn't obviate the need to go through the exhaustion process first. At the hearing before Judge Ellison, I think 1983 was mentioned once by one of the lawyers. I never saw Judge Ellison reference it, although at the end he said, I believe this is an IDEA case. How is 1983 not properly pled in this instance? Just state your opinion on why they haven't pled, for example, municipal liability. Sure. My response is that there's just a fundamental lack of any allegations supporting the elements of municipal liability. First off, you always want to see that policymaker present in the pleadings in order to get over that first short hurdle of Mon-El. And here, under Texas law, it could not be clearer that the sole and exclusive policymaker for a school district in the state of Texas is its Board of Trustees. The Board of Trustees is absolutely, entirely, and wholly absent from any allegation in this record. And I have read the speculation about, well, they must have been involved at some point, somewhere, somehow, and even if that had been written in the complaint that way, that's not rising, obviously, beyond the level of speculation necessary to achieve the pleading standard in response to a 12b-6 motion or a review of a 12b-6 motion. Also, the lack of a policy here is pretty key. So the only policy referenced by my colleague in his argument of New Caney ISD is our anti-discrimination policy. Well, it would be far-fetched to argue that a school district's anti-discrimination policy was the moving force behind the alleged discrimination, and that's not alleged anyway. And then the other side of it is this Department of Education report, which is about TEAs. I don't know if it stretched all the way to a policy, but it was certainly a practice recommendation that school districts should attempt to keep their special education population below an 8.5% range. And what TEA was told, what that made happen, was that the child find requirement of the IDEA was violated, meaning that school districts were avoiding their obligation to identify students who may need special education services. And the means that they were doing that, instead of identifying somebody for special education in order to stay below that cap, was to use other interventions like RTI, which is response intervention, and Section 504 services to identify students who may need accommodations for their disabilities versus modifications to the education program under the IDEA. So school districts were using these other mechanisms to get around their IDEA child find requirements. The major problem with that, I think, was tacitly conceded earlier was that New Caney ISD is not a school district that was listed as part of the investigation that led to these results. The two Houston-area school districts that are listed specifically in the record in that Department of Education report are Houston ISD and Fort Bend ISD, not New Caney ISD. A pretty fundamental flaw in this is that we didn't mess up with child find with Christopher McMillan. He was identified for special education services and was receiving them under the IDEA. So this DE report about you messed up on child find, TEA, really, really, really doesn't have any effect on this particular case. And then it begs the question, when this report is placed into the record as support of a policy of New Caney ISD, which it's not, it's an IDEA report. It's about special education, which goes right back to the fact that this is a special education case that should have been exhausted through the IDEA procedures. And one other thing about that report. And you think that's true for the 1983 claim as well? Absolutely. Absolutely. It's absolutely true for the 1983 claim as well because 1983, when the gravamen of that complaint is the same, it's the failure to provide a FAPE needs to be exhausted first before you can bring those other subsumed claims. It is mentioned a few times in the record and in the opening brief on appeal that the Department of Education's report has something to do with findings against school districts under Section 504. And I just wanted to call attention to the fact that the Office of Special Ed Programs, which is the wing of the Department of Education that led this investigation in the TEA, explicitly states in the report, we do not have authority to review practices and procedures under Section 504, so we're not making findings under 504 about whether a school district violated Section 504. The only reason 504 is referenced is because, as I mentioned, it's one of the methods that TEA's 8.5% cap on special education students use to get around child fine, using Section 504 accommodations, using RTI, using limited English proficiency, reading difficulties, things like that. But there is not a finding anywhere in the report against TEA that school districts were violating 504, so that's not evidence that McKinney violated 504. And with my limited time, I wanted to bring up that there was also a reference made in the opening argument here today that if we're taking the only thing outside, the only thing that is arguably outside of the FAPE provision would be this agreement between Montgomery County and the parents to remove Christopher McMillan from school. And it was said that this was done because of his disability. But that position is belied in the record. The complaint itself, the third amended complaint itself, lists out all sorts of, you know, wrongs and things that could have, should have, would have happened. But it does say that one of those is that TEA, there was a complaint made to TEA with regard to this case and the way the school district handled it. And in the record, in the third amended complaint, it said that TEA's finding was that New Caney ISD should have shared the information about Christopher McMillan's disability with the district attorney's office and didn't. So that kind of undercuts the idea that that agreement was done because of the disability because it's in the record as an admission that New Caney ISD did not provide the information to the district attorney's office about Christopher McMillan's disability. Is it your view that generally, I won't say absolutely, but generally if you have an IDEA claim, you can't have a 1983 claim? I would say it's probably very unlikely just because the Board of Trustees almost never gets involved. With that, it's normally in the administration. Now, I assume you could have a 1983 claim individually, maybe against an individual state actor versus the municipality itself. But I think it would be a very unique and rare circumstance to see an IDEA claim recast as a 1983 claim for municipal liability purposes. And unless there are other questions, I'm happy to cede back the 30 seconds I have remaining. That's not as generous as I would have liked it to have been. Thank you, Mr. Brosh. I'm glad we have your argument. Thank you. All right. Back to you, Mr. Coleman, if I can rebuttal. Briefly, Your Honor, I'm glad counsel brought up the failure to advise the Montgomery County attorney that my client, in fact, suffered from severe disabilities. What counsel didn't properly tell the court is that that related to the first three days when he was arrested. We're here on a 12B6, aren't we? Yes, sir. So you're going to stay within the four corners of your operative complaint? Yes, sir. Is that in your most operative complaint? Absolutely, sir. So state what's in there. Yes, sir. That they failed to alert the authorities that he was a person with a disability. As a result of that, he spent three days in jail. Time then went on, and the deal was cut. What is your predicate to that? Do you plead in the complaint that they knew the DA was investigating him or they knew the DA had arrested him? We've pled that that was the other thing my colleague, I think, misspoke. All of this was arranged and derived by and instituted by New Caney. The threats of the terrorism, the turning in of the complainant, all of that is from New Caney. As a result of that. . . Who at New Caney? Do you plead that? The Gang of Five, Your Honor, as I referenced them. Because all five of them were involved. It went straight up the ladder and finally to the principal. I thought he acknowledged, he said they have a statutory duty to report threats like that. So I think when he said they reported it, that's how the law enforcement found out. They reported it and then pursued it. What does that mean, pursued it? They were not simply innocent people that were not going to testify at trial. I mean, obviously. . . They have to testify. Of course. Ma'am, the clock is not working. Well, it's. . . People have to testify in a criminal case if they're subpoenaed. Well, it's often the case that people issue affidavits of non-prosecution. That wasn't the case here. We didn't have to do that because they cut our better deal. The better deal was you're banned entirely. One other issue, the issue of damages. . . Do you want to undo the deal? I mean, would that reinstate the felony charges? It seems you want to undo the deal. I'm seeking damages because of the deal, Your Honor, and that takes me to the damages issue. All of the cases that were cited in the cases that the Third Circuit or perhaps another circuit that was referenced that talk about the damages cases before in these matters. What would your damages be? I mean, whether in retrospect you wish you'd done the deal or not, you got something very significant, which is the dismissal of felony charges. Which he was innocent of anyway. But he was also banned from a public building, and the damages we're seeking are damages related to that. Again, what could the hearing officer have done? The hearing officer could have issued compensatory damages. That's all. And that's the magic phrase under this fed law. Compensatory damages are not what we're seeking. We have a young man who was banned from ever again entering a public building because of his disability. It's not a fake choice that he faced. He didn't fake. . . He wasn't faced with you can have a fake or felony. The choice that was made was you're out of here forever. To get rid of the felony, you're out of here forever. My closing remark is it's not a question of whether it was a fair and appropriate education. That is a fake issue. This is a case of no education. None. You're banned. You cannot go back ever. With my understanding of counsel officer's answer to my question about the expulsion triggering this alternative program, that that's part and parcel of the expulsion. He said that's not putting him out on the street. So that was part of it. So how does that, if that was offered and part of the original complaint, how does that get caught up in the deal you're talking about? That was with the school district. Sure. And that's something that the hearing officer could have dealt with if there had been a DAEP following through with that or a manifestation determination hearing. All of that became moot to the family. The minute that they were forced and coerced into this deal. And it's not rank speculation to suggest to the court that the county attorney was in communication with somebody at the school. How else does that occur? How are they forced and coerced any more than the plea deals that happen every day that are often put defendants in very difficult situations but are considered to be legitimate agreements? Well, one, in this case, the deal was based entirely on something that was related to his disability. And so the ban that was placed because of the disability is illegal. It was discriminatory. It's not that it was coerced. It was discriminatory. It was discriminatory. Thank you, Your Honor. That's correct. And so, again, our position is, and I've gone over. I thank you very much for the opportunity. It was a pleasure to be here, and I look forward to perhaps seeing you all again. Thank you. Thank you, Mr. Gorman. Mr. Rush, thank you for your briefing.